THE HONORABLE TIFFANY M. CARTWRIGHT

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. CR23-5356 TMC |
| Plaintiff, | |
| v. | FRANKLIN NWADIALO'S SENTENCING MEMORANDUM |
| FRANKLIN IKECHUKWU NWADIALO, | Hrg: June 22, 2026 at 1:30 p.m. |
| Defendant. | |

## I.    SUMMARY

Franklin Nwadialo grew up as an orphan in Nigeria. He was adopted by a family that enslaved, beat, and starved him. With little guidance and limited opportunities, he committed romance fraud to support himself. He takes full responsibility for this.

Despite his mistakes, Mr. Nwadialo has always tried to improve himself and help his community. He worked hard and earned a scholarship that allowed him to obtain a master's degree in international relations. He was elected mayor of the local township in which he lived. In that role, he successfully advocated for several public works improvements.

His election, however, came at a cost, as a terrorist group bankrolled his campaign; he remains indebted to them to this day. Members of that group horribly assaulted him in 2021 and have blackmailed and threatened him ever since. That same group beheaded a friend of his who refused to bow to its demands. Mr. Nwadialo then raised his friend's orphaned children as his own.

FRANKLIN NWADIALO'S SENTENCING
MEMORANDUM
(*United States v. Nwadialo*, CR23-5356 TMC) - 1

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

Had Mr. Nwadialo been born in the United States, his story would have been different. But he was unable to escape the corrupting influences that infect his home country.

Mr. Nwadialo is anguished by the harm he caused the victims and his family. If forgiveness for his sins is not possible, he asks for some understanding; the life he was born into – which eventually blessed him with a loving wife and children he adores – has often been nearly unbearable to live. Despite an uncertain future, he is committed to being his best self moving forward.

Mr. Nwadialo asks the Court to accept the plea agreement and sentence him to 60 months' incarceration, as both parties and the USPO recommend.

**II.    A 60-MONTH SENTENCE IS SUPPORTED BY MANY FACTORS.**

**A.    To understand how Mr. Nwadialo came to his current predicament, it is helpful to understand the environment in which he grew.**

The USPO office rightly describes Mr. Nwadialo's childhood as "unfathomable."[1] Before explaining just how horrible that childhood was, as well as the immense challenges he faced later in life, some background regarding the reality of living in Nigeria is provided to help explain what brought Mr. Nwadialo to this point. To that end, the defense retained Matthew Page, an expert in Nigerian history, politics, and culture. Mr. Page has studied Nigeria for nearly a quarter of a century, holding prestigious positions with the Department of State, the Department of Defense, and the U.S. Marine Corps. His report is attached as Exhibit 1, from which the following information is drawn.

---

[1] USPO Recommendation at 2 ("The childhood Mr. Nwadialo experienced is unfathomable. He was subjected to severe beatings and mistreatment, including his adoptive father attempting to kill him on multiple occasions.").

FRANKLIN NWADIALO'S SENTENCING
MEMORANDUM
(*United States v. Nwadialo*, CR23-5356 TMC) - 2

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

By population, Nigeria is the largest country in Africa,[2] having roughly 250 million people.[3] It is projected to become the third-most populated country in the world by 2043,[4] so its problems, unfortunately, will become the world's. Indeed, this case reflects the fact that, to a significant degree, they already have.

Nigeria's levels of crime and corruption are extraordinarily high.[5] So limited are legitimate employment opportunities that 93% of Nigerian's live "hand-to-mouth," engaged in a daily struggle just to survive.[6] A sad consequence of this is that even hardworking and honest Nigerians frequently have "their lives derailed by crime and corruption."[7]

Organized groups of Nigerian origin engage in a wide variety of criminal activities, including drug and human trafficking, money laundering, and cyberfraud.[8] Life in Nigeria is frequently violent: conflict-related deaths in Nigeria exceed the number of fatalities in major war zones like Yemen and Syria.[9] So-called "tiger kidnappings" – where an individual is abducted and forced to carry out some form of

---

[2] *African Countries by Population*, worldometer, 2026, https://www.worldometers.info/population/countries-in-africa-by-population/.

[3] *Id*.; Ex. 1, Expert Report of Matthew Page, at ¶ 13 (June 11, 2026).

[4] Ex. 1 at ¶ 13.

[5] *Id*. at ¶¶ 12, 13.

[6] *Id*. at ¶¶ 12, 13.

[7] *Id*. at ¶ 12.

[8] *Id*. at ¶ 20.

[9] *Id*. at ¶ 19.

FRANKLIN NWADIALO'S SENTENCING
MEMORANDUM
(*United States v. Nwadialo*, CR23-5356 TMC) - 3

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

illegal activity – are common[10]: "an overwhelming majority of Nigerians say abduction and kidnapping constitute grave national problems, with many expressing deep concerns about their personal safety."[11]

The average Nigerian has little recourse when they are victimized, as the police are remarkably corrupt: "In 2016, the World Internal Security and Police Index—an analytical assessment published by the International Police Science Association— ranked the Nigerian police as the world's worst police force."[12] Nigeria's criminal organizations operate without meaningful restraint as a result;[13] if a citizen reports an offense, they are more likely to be further victimized than receive any form of legal redress.[14]

Mr. Page summarizes the conditions on the ground as follows:

> Corruption pervades every sector of public life in Nigeria: massive contract fraud, outright embezzlement, and bribery are just some of its over 500 distinct forms. Criminal organizations operate with . . . impunity, as law enforcement is itself deeply compromised, leaving citizens without meaningful institutional protection.

> The consequences of this crime and corruption fall hardest on ordinary Nigerians seeking honest livelihoods. With 93% of the population trapped in survivalist informal employment and formal jobs gatekept by political connections and bribes, even highly capable and motivated individuals find legitimate paths blocked. As the report emphasizes, these conditions frequently ensnare the most intelligent and hardworking Nigerians, drawing them into criminal activity not out of moral failure but structural

---

[10] *Id*. at ¶ 21.

[11] *Id*. at ¶ 19.

[12] *Id*. at ¶ 19.

[13] *Id*. at ¶ 22.

[14] *Id*. at ¶ 24.

FRANKLIN NWADIALO'S SENTENCING
MEMORANDUM
(*United States v. Nwadialo*, CR23-5356 TMC) - 4

necessity — a reality that expert analysis traces as a defining feature of Nigerian society rather than an exception to it.

Exhibit 1 at ¶¶ 27, 28.

In addition to corruption and crime, societal treatment of children is different in Nigeria than the United States. A UNICEF report on Nigeria "found that 61% of caretakers believed that physical punishment was necessary in the raising of children" and that "34% of children were subjected to severe physical punishment,"[15] where "indicators of physical violence included punching, kicking, whipping, beating with an object, choking, suffocating, attempted drowning, intentional burning, using or threatening with a knife, gun or other weapon."[16] Exacerbating matters, "Nigeria has a large population of children who are orphans, who engage in child labor, and/or who do not attend school. Global evidence shows that these children are particularly vulnerable to violence."[17]

> **B.    Mr. Nwadialo's childhood was marred by every possible form of abuse. Despite this, he committed himself to work in the public sector and was able to improve the living conditions for his community. Ultimately, his ability to serve his community was compromised by a violent assault and associated blackmail.**

It would be difficult to overstate how bad Mr. Nwadialo's childhood was. He was adopted into a family who used him as a houseboy, something close to a slave, really.[18] He was neglected, poorly fed, and severely beaten.[19] His adoptive father

---

[15] *Violence Against Children in Nigeria: Findings from a National Survey 2014*, UNICEF Nigeria, at 6 (2015), https://www.unicef.org/nigeria/media/1586/file/Nigeria-violence-against-children-national-survey.pdf.pdf.

[16] *Id*. at xvi.

[17] *Id*. at 7.

[18] PSR ¶¶ 49-52.

[19] PSR ¶ 49.

FRANKLIN NWADIALO'S SENTENCING
MEMORANDUM
(*United States v. Nwadialo*, CR23-5356 TMC) - 5

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

stabbed him on multiple occasions, leaving permanent scars.[20] He also struck him in the head so hard with a bottle that glass fragments remain embedded in his skull today.[21] There is no functional child protective services department in Nigeria,[22] so all this abuse went unchecked for years. He was also sexually abused by a neighbor.[23] There was no recourse for that either.[24] Until he escaped to live with his grandmother at age 14, he was bruised and bandaged almost every day of his life.[25]

Mr. Nwadialo resorted to romance fraud as a means to survive. This mistake obviously cost him and victims in this case dearly. But he also was a smart young man. He earned scholarships that allowed him to obtain his master's degree.[26] He opened a small grocery store for several years in his town before trying to run for mayor. After one failed attempt, he was elected mayor of his township.[27] In that capacity, he worked to bring water, electricity and healthcare workers to his rural community.

But he was targeted by a terrorist separatist group known as IPOB, or Indigenous People of Biafra, who drugged and raped him. They recorded that rape and then

---

[20] PSR ¶ 50.

[21] PSR ¶ 50.

[22] *See* PSR ¶ 50 ("law enforcement does not get involved in family violence in Nigeria").

[23] PSR ¶ 51.

[24] PSR ¶ 51.

[25] PSR ¶ 50.

[26] PSR ¶ 74.

[27] PSR ¶ 76.

FRANKLIN NWADIALO'S SENTENCING
MEMORANDUM
(*United States v. Nwadialo*, CR23-5356 TMC) - 6

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

blackmailed him with the resulting video. He tried to report the offense but was ridiculed by the police. He thereafter learned to do what he was told. As he stated to counsel, "It was like these people stole my dignity."

Under threats of death, IPOB tasked him with recruiting another political leader into the fold, his friend Okechukwu Okeye.[28] To his eternal regret, he did so, and his friend was similarly blackmailed. Mr. Okeye refused to acquiesce to IPOB's demands, so they beheaded him.[29] Mr. Nwadialo then raised Mr. Okeye's children as his own. Mr. Nwadialo remains financially indebted to IPOB and he and his family fear for their safety as a result.[30]

### C.    Mr. Nwadialo's apology letter.

Mr. Nwadialo wrote a letter in which he apologizes to the victims, his family and the Court. Select portions of that letter provide:

> I want to take the time to apologize to your honor, the victims of my actions, the Court, lawyers, my wife, sister, brother and my kids (my family) for the pains, trauma and anxiety that I have put them through. I want you to know that I take full responsibility for my actions and have begun a self assessment process on how I got here.
>
> . . . .
>
> My upbringing was not an ideal one as a child, I had no guide, love and family that showed me any form of belonging and after serving as a slave in a home that I was supposedly adopted at 8 months old. I decided to leave home at 14 years old. Thankfully, my grandmother took me in. She was kind and caring but we were poor and there was only little she could do for us to survive by the day.

---

[28] PSR ¶¶ 58-59.

[29] *Okechukwu Okeye*, Wikipedia, https://en.wikipedia.org/wiki/Okechukwu_Okoye; https://guardian.ng/news/police-in-anambra-confirm-okoyes-death/ (last viewed June 15, 2026); PSR ¶ 59.

[30] *See* PSR ¶ 78.

FRANKLIN NWADIALO'S SENTENCING
MEMORANDUM
(*United States v. Nwadialo*, CR23-5356 TMC) - 7

**FEDERAL PUBLIC DEFENDER**
1331 Broadway, Suite 400
Tacoma, WA 98402
(253) 593-6710

There is a lot of corruption in Nigeria and it is hard just to get by daily which helped push me into some bad elements on the street trying to find my place. While on the streets, I was introduced to one of the only economic survival means in my locality which is romance fraud. It was the knowledge that I obtained during those years that I used to work for a group called the Indigenous People of Biafra (IPOB). . . .

Your Honor, I was initiated into this group through a painful gang rape and being videoed during the process after my drink was spiked. I was threatened that the video will be used against me if I ever mention it. As part of my assignment, I introduced my friend Mr. Okechukwu Okeye … to IPOB and they did the same initiation to him but somehow he fought with them and he was beheaded after a few months. I adopted his four daughters as I felt directly responsible for them.

Since I left IPOB, I have been regretting my entire life and the pains I have caused the victims of my actions and have contemplated suicide many times, but having 10 kids and 9 to provide for was worth trying to live. I have a loving wife who just had my last child on my birthday last year while in prison and she has been supporting me emotionally and willing to give me another chance to rewrite my wrongs.

. . .

Your Honor, I will never engage in any acts of fraudulent activity or crime ever again as it is evil, wicked and devastating and the cost on me has had adverse effects mentally, physically, emotionally and otherwise and the thought of it makes me tear up. I know my life will be hard. I am afraid to return to Nigeria because I am indebted to IPOB and I fear they will do me harm. I want to support my family and ensure that my kids do not make the same mistakes that I did.

Letter of Franklin Nwadialo to the Court (attached as Exhibit 2).

### D.    Mr. Nwadialo's wife continues to support him.

Mr. Nwadialo and his wife, Maryblessing Nwadialo, understand that their path going forward will remain difficult, given his imprisonment and the fact that the family is living in fear. Nevertheless, they are committed to caring for each other. Maryblessing has written the Court a letter, which provides, in part:

Franklin is good person who cares about himself and the community. But life in Nigeria is never easy, and his life has been especially hard. In 2021, he was assaulted in horrible ways by a terrorist group who then

FRANKLIN NWADIALO'S SENTENCING
MEMORANDUM
(*United States v. Nwadialo*, CR23-5356 TMC) - 8

**FEDERAL PUBLIC DEFENDER**
1331 Broadway, Suite 400
Tacoma, WA 98402
(253) 593-6710

blackmailed him. I witnessed the change in his personality after this assault. He was withdrawn and became a shell of himself. He was never the same after that.

Things went for very bad to something worse after his friend Okechukwu Okoye was beheaded by that same terrorist group. My husband cried and mourned Okechukwu for a long time, did his best to see that his friend was buried well. After the burial, Okechukwu's children were left alone scared, Franklin went out of his way and adopted them and he's been trying his possible best to give them a good life so far, he had become their last line of hope to life and his absence has adverse effects on these kids.

My husband feared that he would be killed by the terrorists. He was scared for his life and was trying to figure out how best to protect himself and his family. I know that he made grave mistakes, but he is not a bad man. He is a good person, and we love him very much.

His absence has created significant hardships for our family. We miss his guidance, support, protection and presence every day. We are constantly facing threats from the terrorist group since his detention. We have moved twice to a different apartment for security reasons and for our safety.

The couple of times we have talked, he deeply regrets his actions, even though he was caught between the shark and the deep blue sea he still wished [sic] he had done things differently. I remain confident that he has learnt his lessons. I respectfully ask the court to temper justice with mercy. . . .

Letter of Maryblessing Nwadialo to the Court (attached as Exhibit 3).

## III.    RESTITUTION

As part of the plea agreement, Mr. Nwadialo agreed to forfeit his interest in a money judgement in the amount of $2,300,000.[31] An Order of Forfeiture for that amount has, on the Government's motion, already been issued by the Court.[32] A week before this Sentencing Memorandum was due, however, the Government advised the

[31] Dkt. 48 at ¶ 13.

[32] Dkts. 52-53.

FRANKLIN NWADIALO'S SENTENCING MEMORANDUM
(*United States v. Nwadialo*, CR23-5356 TMC) - 9

**FEDERAL PUBLIC DEFENDER**
1331 Broadway, Suite 400
Tacoma, WA 98402
(253) 593-6710

defense that it had received additional restitution requests in excess of the $2.3 million dollar judgment. As of this writing, the defense has not received all the documentation regarding these requests. The defense may be able to stipulate to them, but asks that a restitution hearing be set in the month of July to provide counsel with sufficient time to review the new material with Mr. Nwadialo.

## IV.    A SENTENCE GREATER THAN SIXTY MONTHS IS UNWARRANTED.

As noted, Mr. Nwadialo has acknowledged the pain and financial hardship that he has caused the victims.[33] Some of these victims have called for a greater sentence than the parties negotiated, with one even asking for the maximum possible sentence, twenty years.[34] These requests for greater punishment should not be followed, as doing so would impart greater than necessary punishment and result in unwarranted sentencing disparities, contrary to directives of 18 U.S.C. § 3553(a). This can be readily seen by comparing the recommended sentence to the PSR's JSIN data and to other sentences imposed for recent fraud cases prosecuted in this district. Before turning to those comparisons, however, it is important to recognize the limitations of the fraud guideline, USSG §2B1.1.

---

[33] *See* Exhibit 2 and discussion *supra*.

[34] *See* Victim Impact Statement Addendum. It should also be noted that, consistent with the plea agreement that explicitly declares that several co-schemers were involved in this fraud, dkt. 48 at ¶ 8, the victim who calls for the maximum possible punishment notes that even after Mr. Nwadialo's arrest, she continued to receive texts from people who apparently sought to defraud her. *See id.*, Letter of Victim J.C. to Judge Fricke (December 21, 2024). Given this, it is unlikely that Mr. Nwadialo is singularly responsible for J.C.'s losses, although he does not dispute that he is legally responsible for the $2.3 million in funds that were transferred to electronic wallets that he controlled. *See* Plea Agreement, dkt. 48 at ¶ 8(i). Consistent with the Financial Disclosure Statement that he provided to the Government as part of that plea agreement, dkt. 48 at ¶ 12(b), however, Mr. Nwadialo is not in possession of such funds today; indeed, he is currently indebted to IPOB, PSR ¶ 78, and, as noted, fears for his life because of that. *See* Exhibit 2 at 4 and Exhibit 3 at 2.

FRANKLIN NWADIALO'S SENTENCING
MEMORANDUM
(*United States v. Nwadialo*, CR23-5356 TMC) - 10

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

### A.     The guideline that provides the advisory sentence in this case is heavily flawed and should not be followed.

The fraud guideline assigns a low base offense level but provides for wild adjustments based on loss amount.[35] As will be detailed below, this approach has been criticized for placing an undue emphasis on the loss amount and providing draconian sentence ranges that are not supported by empirical data.

As Judge Jed S. Rakoff – who is considered a leading expert on the fraud guidelines[36] – has noted: "By making a Guidelines sentence turn[] on this single factor [loss or gain], the Sentencing Commission effectively ignored [3553(a)] and . . . effectively guaranteed that many such sentences would be irrational on their face." *United States v. Gupta*, 904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012), *aff'd*, 747 F.3d 111 (2d Cir. 2014). At least one circuit has ruled that the structure of the Guideline provides a basis to deviate downward from the associated advisory range. *United States v. Algahaim*, 842 F.3d 796, 800 (2d Cir. 2016) (noting that the Sentencing Commission's decision to set a "rather low base offense level" and then have it "increased significantly by a loss enhancement" is "unknown to other sentencing systems" and

---

[35] In this case, the loss adjustment is more than double the base offense level, as an increase of 18 levels applies. USSG §2B1.1(b)(1)(J); PSR ¶ 27. The United States Sentencing Commission, however, has recently proposed adjusting the fraud guideline to account for inflation. The impact of this change – which will take effect on November 1, 2026 – is to lower the loss enhancement that applies to Mr. Nwadialo's case to 16; rendering his Total Offense Level 28, as opposed to 30, and resulting in an advisory range of 78 to 97 months, instead of 97 to 121 months. *See* USSC, "Amendments to the Sentencing Guidelines" at 28 (April 30, 2026) (https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/202605_RF.pdf). This pending amendment provides further support for the argument that a sentence greater than that agreed to by the parties would be unjust.

[36] *See* Mark W. Bennett, Justin D. Levinson, Koichi Hioki, *Judging Federal White-Collar Fraud Sentencing: An Empirical Study Revealing the Need for Further Reform*, 102 Iowa L. Rev. 939, 974 (2017).

FRANKLIN NWADIALO'S SENTENCING
MEMORANDUM
(*United States v. Nwadialo*, CR23-5356 TMC) - 11

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

remanding the case "to permit the sentencing judge to consider whether the significant effect of the loss enhancement, in relation to the low base offense level, should result in a non-Guidelines sentence."); *see also United States v. Adelson*, 441 F. Supp. 2d 506, 509 (S.D.N.Y. 2006) (criticizing "the inordinate emphasis that the Sentencing Guidelines place in fraud cases on the amount of actual or intended financial loss" without any explanation of "why it is appropriate to accord such huge weight to [this] factor"). This is not to say that the loss amount is irrelevant to sentencing, *see, e.g., United States v. Emmenegger*, 329 F. Supp. 2d 416, 427-28 (S.D.N.Y. 2004) ("The rough magnitude of the theft is relevant to sentencing, but the particular amount stolen is not as significant."), but the Guideline places so much emphasis on loss that all other § 3553(a) sentencing considerations risk being overridden.

With regard to the draconian sentences that the fraud guideline produces, consider that it recommends a sentence that is 500 times greater than the guidelines would have recommended in 1987:

> [A fraud defendant in case involving a $12.5 million dollar loss in 1987] would have faced a Guidelines sentence of 30–37 months; but by 2003, the same defendant would have faced a Guidelines sentence of 151–188 months, a more than 500% increase. Was such a crime really 500% worse in 2003 than it was in 1987? Had any of the factors that underlie rational sentencing so radically changed as to warrant such a huge increase?

*United States v. Gupta*, 904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012), *aff'd,* 747 F.3d 111 (2d Cir. 2014).

Numerous cases have criticized USSG §2B1.1 on similar grounds. *See, e.g.,* Mark W. Bennett, Justin D. Levinson, Koichi Hioki, *Judging Federal White-Collar Fraud Sentencing: An Empirical Study Revealing the Need for Further Reform*, 102 Iowa L. Rev. 939, 973-75 (2017) (collecting opinions calling the fraud guidelines "a black stain on common sense"; "patently unreasonable" and "so run amok that they are patently absurd on their face"; "of no help"; both "fundamentally flawed" and

FRANKLIN NWADIALO'S SENTENCING
MEMORANDUM
(*United States v. Nwadialo*, CR23-5356 TMC) - 12

**FEDERAL PUBLIC DEFENDER**
1331 Broadway, Suite 400
Tacoma, WA 98402
(253) 593-6710

"valueless"; and "more the product of speculation, whim, or abstract number-crunching than of any rigorous methodology—thus maximizing the risk of injustice").

**B.      The JSIN data strongly supports that argument that a sentence greater than 60 months cannot be justified.**

The JSIN data presented as an addendum to the PSR shows that the median sentence for fraud defendants with the same advisory range and Criminal History Category as Mr. Nwadialo's is 60 months.[37] This is exactly the sentence recommended by the parties and the USPO. Given this, the JSIN data strongly contradicts any suggestion that a sentence greater than a 60-month sentence is called for here.

**C.      A sampling of other fraud sentences demonstrates that the advisory guideline range is routinely not followed in this district. These comparison cases strongly support the argument that a sentence greater than 60 months would create an unwarranted sentencing disparity.**

Every case presents a unique set of circumstances relevant to the offense and to the personal circumstances of the accused. Consequently, it is a challenging exercise to meaningfully compare cases in a few sentences. Nevertheless, the fact that a punishment of greater than sixty months would be excessive in this case is apparent from an inspection of sentences imposed for similar offenses in this district.

---

[37] The relevant potion of the JSIN addendum provides:

> During the last five fiscal years (FY2021-2025), there were 183 defendants whose primary guideline was §2B1.1, with a Final Offense Level of 28 and a Criminal History Category of I, after excluding defendants who received a §5K1.1 substantial assistance departure. For the 181 defendants (99%) who received a sentence of imprisonment in whole or in part, the average length of imprisonment imposed was 62 month(s) and the median length of imprisonment imposed was 60 month(s). For all 183 defendants in the cell, the average sentence imposed was 62 month(s) and the median sentence imposed was 60 month(s).

JSIN Addendum to PSR at 1.

FRANKLIN NWADIALO'S SENTENCING
MEMORANDUM
(*United States v. Nwadialo*, CR23-5356 TMC) - 13

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

The USPO's recommendation identifies two comparison cases. The first is *United States v. Radcliffe*, CR25-222-LK (W.D.WA 2025), where the accused received a thirty-month sentence for defrauding an elderly widow, causing the loss of her home and her life savings. The loss in that case was $515,000 and the advisory range was 51-71 months.[38]

The second case is *United States v. Carty*, CR24-5240-TMC (W.D. Wash. 2024). According to the Government, the defendant in that case "perpetuated a long-running lottery scam designed to steal hundreds of thousands of dollars from vulnerable senior citizens."[39] The loss amount in that case was over $1 million.[40] The USPO notes that Mr. Carty "took advantage of a widow and managed to deceive her out of all of her life savings, [causing her] to sell[] her home and provide[]him with the proceeds."[41] He received a thirty-six month sentence with no supervision to follow.[42]

A number of other cases provide further support for the proposition that any request for a sentence greater than sixty months would create a harsh and unwarranted sentencing disparity. For example *United States v. Potapenko and Turogin*, CR22-00185-RSL (W.D. Wash. 2022) involved a $577 million cryptocurrency fraud. The Government called it "the largest fraud every prosecuted in the history of this District

[38] USPO Sentencing Recommendation at 3.

[39] Dkt. 43 at 1.

[40] USPO Sentencing Recommendation at 3.

[41] *Id*.

[42] Dkt. 54.

FRANKLIN NWADIALO'S SENTENCING MEMORANDUM
(*United States v. Nwadialo*, CR23-5356 TMC) - 14

**FEDERAL PUBLIC DEFENDER**
1331 Broadway, Suite 400
Tacoma, WA 98402
(253) 593-6710

(and a massive fraud even by any national standard)."[43] The defendants in that case each received a time-served sentence that approximated 16 months.[44]

Similarly, in *United States v. Almezal et al*, CR24-101-RSL (W.D. Wash. 2024), five conspirators engaged in a scheme where they defrauded retailers over $1.2 million.[45] Each of them was released on bond and eventually given time-served sentences (for Ms. Almezal, this amounted to four days)[46] with three years of supervision.[47]

In *United States v. Nguyen*, CR21-182-RSL (W.D. Wash. 2021), the defendant diverted his employer's shipping labels to an online resale marketplace resulting in losses over $500,000.[48] He was sentenced to three years of probation, with six months of home confinement.[49]

In *United States v. Clevenger*, CR25-5102-TMC (W.D. Wash. 2025), the defendant embezzled nearly $1 million from a small city where she worked as the City

---

[43] Dkt. 208 at 1.

[44] Dkt. 215 at 75; dkts. 228-231.

[45] Dkt. 201 at 1.

[46] *Compare* dkt. 39 (arrest date of June 13, 2024) *with* dkt. 51 (appearance bond issued on June 17, 2024).

[47] *See* Dkt. 237 at 3.

[48] Dkt. 36 at 1.

[49] Dkts. 44-45.

FRANKLIN NWADIALO'S SENTENCING
MEMORANDUM
(*United States v. Nwadialo*, CR23-5356 TMC) - 15

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

Clerk/Treasurer. The advisory range in that case was 51 to 63 months.[50] Ms. Clevenger was sentenced to five years of probation.[51]

In *United States v. Parks*, CR24-0175-RAJ (W.D. Wash. 2025), the defendant was an attorney who embezzled a $1.66 million judgment awarded to his client, leaving his 70-year-old and cognitively impaired client destitute.[52] A Washington State Bar Association investigation concluded that Mr. Parks also misappropriated $300,000 from another elderly client's trust.[53] Collectively, these misappropriations totaled about $830,000.[54] Mr. Parks received an 18-month prison sentence.[55]

While the amount of loss in this case is greater than most of the WDWA cases cited above, it is not greater than "the largest fraud every prosecuted in the history of this District," for which a 16-month sentence was imposed. *See Potapenko*, *supra*. Nor, presumably, is it materially greater than the cases reflected by the JSIN data, given that the amount of loss is the primary driver behind any advisory sentence calculated under the fraud guideline, USSG §2B1.1, and the 183 cases for that JSIN data all involved the same advisory range and same Criminal History Category as this case.

But even if one were to accept that the amount of loss distinguishes Mr. Nwadialo's case from the cases discussed above, a sentence greater than 60 months still could not be supported for at least three compelling reasons.

---

[50] Dkt. 24 at 3.

[51] Dkt. 30.

[52] Dkt. 38 at 1.

[53] Dkt. 38 at 7.

[54] *Id.*; Dkt. 26 at 10.

[55] Dkt. 39.

FRANKLIN NWADIALO'S SENTENCING
MEMORANDUM
(*United States v. Nwadialo*, CR23-5356 TMC) - 16

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

First, the loss amounts in the cases described above are all substantial, and, in each case, the accused received a sentence of *far less* than 60 months.

Second, few individuals have mitigation as compelling as Mr. Nwadialo's. This point can be quickly illustrated by that fact that is not routine for the USPO to describe a person's childhood as "unfathomable." Nor it is routine for a fraud case to involve a friend's beheading or a videotaped rape of the offender.

Third, the time that Mr. Nwadialo serves will be especially punitive due to his immigration status. He will, for example, be barred from serving his time at a minimum-security prison even though first-time offenders convicted of fraud would otherwise be designated as such a facility. He will also serve his entire sentence in full custody, since his immigration detainer will prevent his release to a halfway house. And he will not be able to apply First Step Act time credits to his sentence since a final removal order will certainly be issued during his term of imprisonment. *See* 18 U.S.C. § 3632(d)(4)(E) (credits cannot be applied if the person is subject to a final removal order); 28 C.F.R. § 523.44(a)(2) (same).

For these reasons, the "60 months" that the parties recommend Mr. Nwadialo serve will be harsher than a 60-month sentence imposed on a United States citizen. This fact further undermines the idea that any sentence greater than 60 months is necessary. *See* PSR ¶ 96 (citing *United States v. Charry Cubillos*, 91 F.3d 1342, 1344 (9th Cir. 1996) for the proposition that the Court can consider the especially harsh conditions of confinement that confront those with immigration detainers as a basis for leniency).

## V.   THE COURT SHOULD NOT IMPOSE A TERM OF SUPERVISED RELEASE.

Given that Mr. Nwadialo will be removed from this country, the defense agrees with the USPO that no supervised release should be imposed. *See* USPO Recommendation at 1, 3 (noting that the USAO Financial Litigation Unit confirmed

FRANKLIN NWADIALO'S SENTENCING
MEMORANDUM
(*United States v. Nwadialo*, CR23-5356 TMC) - 17

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

that a term of supervised release would not provide that "office with any additional assistance in collecting restitution"); *see also* USSG § 5D1.1(c) ("The court ordinarily should not impose a term of supervised release in a case in which supervised release is not required by statute and the defendant is a deportable [person] who likely will be deported after imprisonment."); *accord Carty*, *supra*.

## VI.    CONCLUSION

The Court should impose the agreed negotiated sentence of sixty months, with no supervision to follow.

DATED this 15th day of June, 2026.

Respectfully submitted,

*s/ John R. Carpenter*
*s/ Lindsay McCaslin*
Attorneys for Franklin Nwadialo

FRANKLIN NWADIALO'S SENTENCING
MEMORANDUM
(*United States v. Nwadialo*, CR23-5356 TMC) - 18

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**